**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DONNA M. MAGNI,** | : | **3:15-CV-01177-RDM** |
| **Plaintiff,** | : | |
| | : | |
| | : | **(Judge Mariani)** |
| **vs.** | : | |
| | : | |
| **TIMES SHAMROCK** | : | **(Magistrate Judge Carlson)** |
| **COMMUNICATIONS, et al.,** | : | |
| | : | |
| **Defendants,** | : | |

**REPORT AND RECOMMENDATION**

## I.   INTRODUCTION

This is an action brought Donna Magni, the former Deputy Director of the Luzerne County's Budget and Finance Department, against the County's former Manager, Robert Lawton, and the Director of Budget and Finance, Brian Swetz. In her two remaining claims against these defendants, Ms. Magni alleges that the defendants terminated her on January 31, 2014, out of retaliation for statements that Ms. Magni made months earlier before the County Council regarding an approximately $15 million budget shortfall.

Ms. Magni also claims that the Luzerne County Home Rule Charter and its Personnel Code provided that she could only be terminated for cause, and she argues that the defendant's violated this right by terminating her without due process and without ever even telling her the reason for her firing.

For their part, the defendants argue that Ms. Magni's presentation to the County Council more than three months before she was fired was not protected activity, since it was made pursuant to her official job duties while she was serving as the Interim Director of the County's Budget and Finance Department.  They also steadfastly maintain that Ms. Magni's speech to the County Council was not the reason she was fired.  To the contrary, the defendants maintain that Ms. Magni was terminated on January 31, 2014, after it was discovered that under her watch as the Deputy Director of Budget and Finance the County had issued a number ofW-2s to County employees that contained serious mistakes, which quickly became a controversy that received substantial local media attention.  The defendants also assert that during Ms. Magni's tenure, the County experienced a number of documented issues with its payroll system, for which she was ultimately responsible.

With respect to Ms. Magni's due process claim, the defendants contend that she was not owed the kind of process she claims, since she was either an at-will employee or otherwise was considered an "exempt" employee who could be terminated at the pleasure of her employer, for any reason or no reason, and without the necessity of notice and opportunity to be heard.  The defendants' acknowledge that Luzerne County maintained a Personnel Code that provided career employees could only be terminated for cause, but maintain that under

2

settled Pennsylvania law the County's Personnel Code could not create a legally protected interest in the plaintiff's employment, and that her employment at all times remained either "at will" or exempt.

The defendants have moved for summary judgment on these remaining claims, and their motion has been fully briefed and referred to the undersigned for purposes of preparing a report and recommendation.  For the following reasons, we agree with the defendants that under prevailing law as applied to the evidence in this case, Ms. Magni's remarks to the County Council regarding cash flow and budgetary shortages does not qualify as protected activity under the First Amendment, and therefore her retaliation claim fails as a matter of law.  We further agree that Ms. Magni was not entitled to the due process she claims, and that she cannot rely upon the County's personnel manual to give her a protected property interest in her employment that never existed.  Although we agree with Ms. Magni that there is some confusion in the case law governing the employment status of public employees who work for a municipality that has enacted a Home Rule Charter and which has purported to confer something more than at-will status on its career employees, the confusion in this area compels us to find that even if Ms. Magni had a viable due process claim, the defendants would be entitled to qualified immunity from it.  Accordingly, it will be recommended that the defendants' motion for summary judgment be granted as to both remaining claims.

## II.  <u>**BACKGROUND**</u>

Donna Magni was hired by Luzerne County as Deputy Director/Deputy Chief of Budget and Financial Services on March 7, 2011.  (Def. SMF ¶ 9; Doc. 91, Ex. 4, Deposition of Donna Magni ("Magni Dep.") at 24:9-15.)  As Deputy Director of Budget and Financial Services, Ms. Magni reported to the Director of Budget and Financial Services, which during all times relevant to this case was held by Defendant Brian Swetz.  (Def. SMF ¶ 10; Doc. 91, Ex. 5, Position Description.)  As the Deputy Director, Ms. Magni's duties included, among other things: assisting in preparing budgets; auditing payroll; reviewing budget expenditures; establishing procedures for the processing of financial transactions; and supervising and reviewing other staff.  (Def. SMF ¶ 10; Doc. 91, Ex. 5.)[1]  The parties generally dispute whether Ms. Magni had the opportunity or responsibility to provide input into matters of policy regarding the County's budget and finance

---

[1]   The defendants also assert that the Deputy Director acted as the primary contact for internal and independent auditors, something the plaintiff disputes on the grounds that this aspect of the job appears on a job description that was not in existence at the time Ms. Magni held the position.  Much of the denials regarding the scope of the Deputy Director's job duties, and related matters, are found in an affidavit that the plaintiff made on December 28, 2017, more than a year after she was deposed in this case.  (Doc. 95, Ex. I.)  Much of the affidavit consists of averments that are meant to narrow substantially the scope of the plaintiff's job duties, presumably in order to bolster her assertion that the conduct she alleges led to her termination was taken not in her capacity as the Deputy Director of Budget and Financial Services, but as a private citizen.  As will be discussed, regardless of the plaintiff's efforts to narrow the scope of her "ordinary" job duties, we find that her speech conduct is not protected under the First Amendment, and therefore her retaliation claim necessarily fails as a matter of law.

matters, and whether she enjoyed decision-making authority.  (Compare Def. SMF ¶ 12 with Doc. 95, Ex. I, Magni Affidavit.)

Brian Swetz was hired as a senior County accountant in March 2013.  (Def. SMF ¶ 13.)  After the County's Director of Budget and Financial Services left his employment with the County in June 2013, then-County Manager Robert Lawton designated Mr. Swetz as the County's Interim Director of Budget and Financial Services, which, pursuant to the Luzerne County Charter, could not last for more than 90 days in any one calendar year.  (Def. SMF ¶ 14.)

Mr. Swetz's 90-day term as the Interim Director expired in September 2013 and when Mr. Lawton's first choice to fill the role declined the offer, he turned to Ms. Magni and designated her as the new Interim Director of Budget and Financial Services.  (Def. SMF ¶ 15; Ex. 6 at 28:6-29:1; Ex. 7, Deposition of Robert Lawton at 20:5-13.)  Ms. Magni's term in the position ran from September 10, 2013, until December 10, 2013.  (Def. SMF ¶16.)  Mr. Swetz was thereafter nominated to be the Director of Budget and Financial Services, and that nomination was approved by County Council in late January 2014.  (Def. SMF ¶ 17.)

In October of 2013, while she was serving as the Interim Director, Ms. Magni attended a County Council meeting held in Butler Township.  Prior to the meeting, Ms. Magni asked Mr. Lawton if he wanted her to attend and he replied that it would be "a good idea" if she went.  (Magni Dep. at 27:19-22.)  The parties

dispute whether the Budget Director typically attended such meetings, and Ms. Magni testified that she was not certain whether would be expected to speak at the meeting.  (*Id.* at 27:22-25.)

She testified that during the meeting, the County's former Controller, Walter Griffith, addressed the Council and raised a number of concerns about the County's cash flow and budget shortfalls.  (*Id.* at 28:11-24.)  According to the plaintiff, Lawton and Griffith were antagonistic towards one another, and after Griffith finished with his remarks, Lawton turned to her and said "Now, Donna is going to get up."  (*Id.* at 29:6-10.)  She recalls that she had prepared for the meeting and she knew what the County needed in terms of cash flow in order to get through the end of the year.  She testified that she did not want to be blamed for the County's lack of cash to service its debt obligations and make payroll, so she decided she would "tell the public what's going on."  (*Id.* at 29:16-17.)

Ms. Magni testified that she advised the Council about how much money was coming in from real estate taxes, and how much the County owed on a variety of obligations.  According to her, the Council was "very neutral" when receiving her report, (id. at 29:25), but that Lawton appeared to be unhappy with it, which in essence was that the County had $14 million in expected revenue but $29 million in upcoming expenses.  (*Id.* at 30:3-10.)  She testified that she informed the

Council that she and Mr. Lawton were working together on a plan to address the gap in the budget in order to find a solution. (*Id.* at 30:14-18.)

During the remainder of her term as the Interim Director, the plaintiff recalls that Mr. Lawton wanted her to focus her efforts on getting the County's payroll operation under control, which it appears happened based on Ms. Magni's work that Mr. Lawton relied upon and acted on. (*Id.* at 33:20-35:1.)  Ms. Magni testified that between the October meeting and December 2013, the matter had been "resolved" because they "found the cash to pay our bills." (*Id.* at 32:8-10.)

After her term as Interim Director concluded in December 2013, Ms. Lawton resumed her duties as Deputy Director and in this capacity was responsible for preparing and issuing accurate W-2 tax forms to County employees, among other obligations.[2]  (Magni Dep. at 45:22-1.)  She testified that in the months leading up to January 2014, she was aware of a problem with an outside vendor that provided the software the County used to prepare the W-2s.  According to her, by as late as January 27, 2014, she was still unable even to see the W-2s using the software then being used, even though the County was due to issue more than 1,650 W-2s by January 31, 2014, just four days later.  (Magni Dep. at 38:17-20.)

---

[2]   Ms. Magni testified that her other job duties included processing payroll every two weeks, overseeing budget transfers and cash flow, managing debt payments, and administering the County's timekeeping software.  (Magni Dep. at 46:14-47:2.)

7

Ms. Magni said that she communicated regularly with Mr. Swetz about the problems throughout January.  (*Id.* at 39:15-19.)

As it happened, although Ms. Magni reviewed approximately 11 W-2s that were being issued to Council members to check their accuracy, when the County issued 1,652 W-2s on or about January 31, 2014, many of them contained significant inaccuracies relating to United Way contributions, 401k or 403b deductions, or pension contributions, as well as other inaccuracies, though Ms. Magni testified that she "[did] not know all the specifics."  (Id. at 44:2-3.) The problem received significant attention in the local media, and was a substantial controversy at the time.[3]  (Magni Dep. at 48:4-12.)

The plaintiff was fired on January 31, 2014, the same day the inaccuracies with the W-2s were discovered and employees began to complain and express concerns.  On February 4, 2014, and article appeared in a local paper, The Citizens Voice, which addressed Ms. Magni's firing and the controversy regarding the W-2s.  (Doc. 90, Ex. 17.)  That article stated that "County officials did not disclose the reason Deputy Chief of Budget and Finance Donna Magni was terminated," but the article adds that "sources" and "insiders" indicated that the plaintiff had a history of making mistakes with County books and had "serious payroll issues."  (*Id.*)  Ms.

_____

[3]  Notably, Ms. Magni's W-2 was among those that were found to contain inaccuracies.  (Magni Dep. at 48:16-17.)

Magni contends that the defendants never gave her a clear answer as to why she was fired, or any opportunity respond to the claims that she was responsible.

The County defendants maintain that Ms. Magni was terminated for her performance issues with respect to payroll discrepancies and the W-2 inaccuracies, and not for her report in October 2013 regarding the County's budget shortfall. (Def. SMF ¶ 40.)  The plaintiff insists that these proffered reasons are pretext and contends that her job performance did not play a role in her termination.  (Doc. 94 at ¶ 40.)  The plaintiff argues instead that her firing constituted retaliation for raising the budget issues with the County Council in October 2013, and she argues that she was terminated without receiving due process that she believes she was owed as a career employee with the County.

## III.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In evaluating a motion for summary judgment, a court must determine "whether the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact and whether the moving party is therefore entitled to judgment as a matter of law."  *Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 271 (3d Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  A

9

disputed issue is only "genuine" if there is a sufficient evidentiary basis upon which a reasonable factfinder could find for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   A factual dispute is "material" only if it could affect the outcome of the suit under the governing law. *Doe v. Luzerne Cnty.*, 660 F.3d 169, 175 (3d Cir. 2011) (citing *Gray v. York Papers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992)).   The Court is not tasked with resolving disputed issues of fact, but only with determining whether there exist any factual issues that must be tried. *Anderson*, 477 U.S. at 247-49.

In considering a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Macfarlan*, 675 F.3d at 271; *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 770 (3d Cir. 2009). Where there exist factual issues that cannot be resolved without a credibility determination, the court must credit the non-moving party's evidence over that presented by the moving party. *Liberty Lobby*, 477 U.S. at 255.   However, if there is no factual issue presented, and if only one reasonable conclusion could arise from the record with respect to the potential outcome under the governing law, the court must award summary judgment in favor of the moving party. *Id.* at 250.

The court must review the entire record, but in doing so must take care to "disregard all evidence favorable to the moving party that the jury is not required

10

to believe." *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 150-51 (2000). The task for the court is to examine "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52. In considering this evidence, we note that "a single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment." *Paladino v. Newsome*, 885 F.3d 203, 209 n. 34 (3d Cir. 2018) (quoting *Lupyan v. Corinthian Colleges, Inc.*, 761 F.3d 314, 320 (3d Cir. 2014)). This principle of the rules governing summary judgment holds true "even where . . . the information is self-serving." *Id.* (citing *Lupyan*, 761 F.3d at 321 n.2).

## IV.   DISCUSSION

The only claims remaining in this action are the plaintiff's claims that the defendants unlawfully retaliated against her in violation of the First Amendment when they terminated her employment on January 31, 2014, and that her termination did not comport with due process.[4]   The defendants argue that

---

[4]   The plaintiff originally brought claims alleging a "stigma-plus" due process violation and wrongful discharge, but these claims were dismissed pursuant to prior Order of the Court. In addition, the plaintiff dismissed her claims against the media defendants who reported on the W-2 controversy, and in connection with the defendants' motion for summary judgment has abandoned a third claim alleging defamation under Pennsylvania law, conceding that she does not have sufficient

summary judgment on the retaliation claim is warranted for a number of reasons, among them that the plaintiff's speech activity was made pursuant to and was within the scope of her job duties, and because the plaintiff has insufficient evidence to show that her termination was causally related to her speech activity. The defendants also argue that the decision to terminate the plaintiff's employment had nothing to do with things she discussed in October 2013 about the County's financial insecurity, but instead was driven by the widespread errors that were discovered in the W-2 forms that were distributed to County employees in early 2014. With respect to the due process claim, the defendants argue that the plaintiff was an at-will employee or was otherwise exempt, and not entitled to the due process she was claims was owed. In addition, the defendants argue that they are entitled to qualified immunity on the plaintiff's claims. We consider the arguments separately below.

### A.    First Amendment Retaliation

To prevail on a First Amendment retaliation claim, a public employee must show that (1) the activity in which she engaged was protected by the First Amendment and (2) the protected activity was a substantial factor in the alleged retaliatory action. *Flora v. County of Luzerne*, 776 F.3d 169, 174 (3d Cir. 2015). "A public employee's statement is protected activity when (1) in making it, the

_____

evidence to show that the defendants made the defamatory statements allegedly attributed to them.

employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have an adequate justification for treating the employee differently from any other member of the general public as a result of the statement [the employee] made." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241-42 (3d Cir 2006) (internal quotation marks omitted) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). Public employees who speak pursuant to their official duties do not speak as citizens, and such speech is thus not protected by the First Amendment." *Barnes v. Brown*, Civ. A. No. 16-214, 2016 WL 5376023, at *5 (E.D. Pa. Sept. 26, 2016) (citing *Garcetti*, 547 U.S. at 421).

Whether a public employee's speech is made "pursuant to official duties" is a mixed question of law and fact. *Flora*, 776 F.3d at 175 (citing *Dougherty v. School Dist. of Phila.*, 772 F.3d 979, 988 (3d Cir. 2014)). The inquiry is a practical one, and does not depend on a public employee's job description or list of official duties. *Garcetti*, 547 U.S. at 424-25. Although *Garcetti* did not announce a comprehensive approach for determining whether speech was made pursuant to an employee's job duties, the Supreme Court has made clear that courts are to consider the responsibilities the employee assumed when she "went to work and performed the tasks [she] was paid to perform." *Id.* at 422. The Third Circuit has explained further: "[T]he responsibility of a district court in evaluating whether a public employee's speech was made as a private citizen is to ask whether the

speech at issue was 'outside the scope of his ordinary job responsibilities.'" *Flora*, 776 F.3d at 179 (quoting *Lane v. Franks*, 134 S. Ct. 2369, 2378 (2014)).   The controlling factor is whether the statements were made pursuant to the employee's job duties, in other words, "the utterances were among the things that the employee 'was employed to do.'" *Id.* at 177 (quoting *Garcetti*, 547 U.S. at 421).   However, "whether an employee's speech 'concern[s] the subject matter of [her] employment is 'nondispositive' under *Garcetti*." *Dougherty*, 772 F.3d at 989 (quoting *Garcetti*, 547 U.S. at 421).   Courts should also consider the manner of the speech at is at issue, more than the subject matter itself, and "specifically whether the plaintiff [was] expected, pursuant to [his or her] job duties, to make the speech that is at issue." *Jerri v. Harran*, 625 F. App'x 574, 580 (3d Cir. 2015) (internal quotation marks and citation omitted); see also Barnes, 2016 WL 5376023, at *5.

Speech may be protected even if it is made within the workplace, *Garcetti*, 547 U.S. at 420-21, and speech that merely relates to the employee's job duties may still qualify as protected in some circumstances, *Flora*, 776 F.3d at 176-79 (rejecting the district court's application of a "related to" standard for determining whether public employee speech is protected).   "The scope and content of a plaintiff's job responsibilities is a question of fact, but the ultimate constitutional significance of those facts is a question of law." *Flora*, 776 F.3d at 175.

14

Although there is not an exhaustive list of factors that will govern in each particular case, the Third Circuit has offered some guidance that may inform the Court's inquiry that is required following *Garcetti*:

> (1) whether the employee's speech relates to special knowledge or experience acquired through [the employee's job] . . .; (2) whether the employee raises complaints or concerns about issues relating to [the employee's] job duties up the chain of command at his workplace . . .; (3) whether the speech fell within the employee's designated responsibilities . . .; and (4) whether the employee's speech is in furtherance of [the employee's] designated duties, even if the speech at issue is not part of them.

*Kimmett v. Corbett*, 554 F. App'x 106, 111 (3d Cir. 2014) (internal quotation marks, citations, and footnote omitted).

Guided by the foregoing authority in this area, which has been the subject of considerable development in recent years, we consider whether the plaintiff's speech to the County Council regarding a substantial budget shortfall and cash flow concerns qualifies as protected speech following *Garcetti*, *Lane*, *Dougherty*, *Flora*, and related cases.  We submit that it does not.

At the outset we recognize that the plaintiff has honed in on language found in *Lane* and other decisions focusing on whether the particular speech activity at issue in a given case concerned something that was "ordinarily" part of an employee's job duties.  One need look no further than the plaintiff's affidavit to confirm that this is her focus here, as the entire affidavit is built around what she

claims was and was not part of her job as the Interim Director of Budget and
Finance.  (Doc. 95, Ex. 1, Magni Affidavit.)[5]  Magni also uses her affidavit in
order to make a number of declarations suggesting that she attended the October
County Council meeting entirely of her own volition, and that her attendance there
was not required, was off the clock, included remarks that were unprepared
beforehand, and given solely as a private citizen and not as part of her role as
Interim Director.  Although we are obligated to consider the evidence presented in

---

[5]  For example, the plaintiff makes averments such as "1 My job duties as Interim
Director of Budget and Financial Services for Luzerne County **did not include**
attendance at county council meetings; 2 My job duties as Interim Director of
Budget and Financial Services for Luzerne County **did not include** giving reports
or statements to city council, whether at meetings or otherwise; 3 My job duties as
Interim Director of Budget and Financial Services for Luzerne County **did not
include** giving reports or statements to the general public, whether at meetings or
otherwise; 4 My job duties as Interim Director of Budget and Financial Services
for Luzerne County **did not include** attending the subject October 2013 county
council meeting; 5 My job duties as Interim Director of Budget and Financial
Services for Luzerne County **did not include** giving any report or statement at the
subject October 2013 county council meeting . . . ."  (Doc. 95, Ex. 1, Magni
Affidavit ¶¶1-5) (emphasis added.)
    Although the plaintiff claims that these were not her job duties, it seems
more reasonable to read these assertions as stating that these job duties were tasks
which she did not routinely perform.  It appears that in her role as Interim Director,
Ms. Magni was infrequently called upon to address the Council or to give public
reports; however, for the reasons explained in this report, it is clear that she
attended the October 2013 meeting precisely because Robert Lawton told her that
he wanted her there, and Ms. Magni acknowledged that she "went up as the interim
director of budget and finance."  (Doc. 90, Ex. 4, Magni Dep. at 27:24-25.)  By her
own admission, therefore, she attended this meeting not as a member of the public
intent on speaking out about a matter of public concern but because it was, in fact,
part of her job duties to attend the meeting on that particular night because the
County Manager wanted her there in case she needed to address the Council
regarding budgetary matters, which is exactly what occurred.

the light most favorable to the plaintiff, and to resolve inferences in her favor to the extent it is reasonably possible to do so, some of her representations in her affidavit strain this standard beyond reason and ignore her prior sworn deposition testimony. Ms. Magni testified, under oath, as to the reason she attended the October 2013 meeting with the Council, and she did not say that she went strictly in her capacity as a private citizen with an interest in speaking on a matter of public concern regarding matters that she learned through, and which related to, her work as Interim Director.   To the contrary, she attended the meeting because her boss, Robert Lawton, indicated that he wished for her to be there after she asked him if she should go:

> Q:     And why did you go to [the October 8, 2013] meeting to speak on the issue of the shortfall of $15 million?
>
> A.      I was the interim director and I said to Mr. Lawton, "Do you want me at the meeting?"  He said "Yeah.  It would be a good idea if you went."  Didn't specifically say, "You would be speaking."  Didn't specifically say that I wouldn't.  ***So I went up as the interim director of budget and finance***.

(Doc. 90, Ex. 4, Magni Dep. at 27:16-25) (emphasis added.)   Contrary to any assertions given in a subsequent affidavit which provide little more than bald legal conclusions narrowly defining the scope of her job by asserting what it did not entail, Ms. Magni plainly testified that she attended the October County Council meeting "as the interim director of budget and finance" and that she attended the

meeting after Mr. Lawton told her it would be a good idea, in response to her asking him if he wanted her to attend.  Thus, Ms. Magni conceded that she did not meet with the County Council simply as a member of the public, but instead as the County official in charge of budgetary and finance matters at that time.  It blinks reality to accept Ms. Magni's subsequent statement that neither her attendance at the meeting, nor the statement that she ultimately gave at that meeting, had anything whatsoever to do with her official duties as Interim Director, when she made clear that she attended the meeting "as the interim director of budget and finance" in accordance with the wishes of her boss after she checked with him to determine if she should go as part of her job.

Furthermore, Ms. Magni testified that she did, in fact, prepare for the meeting.  She attested that, "So I had done a little preliminary work in case, you know, I would speak."  (Doc. 90, Ex. 4, Magni Dep. at 28:9-10.)  And, as it turned out, she would speak at that meeting, not of her own volition or because she felt personally compelled to speak out on an issue of public importance, but because Mr. Lawton once again directed her to do so after the County's former Controller, Walter Griffith, openly questioned the County's cash position and inquired about how the County was going to meet its debt obligations.  (*Id.* at 28:11-21.)

Ms. Magni testified that Messrs. Lawton and Griffiths were antagonistic towards one another, even "enemies," and she stated that Griffiths got "a little fired

up" during his remarks, apparently regarding the County's financial situation.  (*Id.*

at 28:22-29:5.)   When Griffiths concluded his remarks or questions, Ms. Magni

testified that Lawton said, "'Okay.  Now, Donna is going to get up.'  He didn't

specifically say about anything to talk about.  He said 'Donna is going to get up.'"

(*Id.* at 29:7-10.)

Ms. Magni testified that she had prepared for this moment:

> I already had my notes about what we needed for
> cash requirements going through to the end of the year.  I
> didn't want to get blamed for not having enough cash in
> the County's coffer to not make payroll, debt service.  I
> thought they are not going to happen under my watch.
> I'm going to tell the public what's going on.  I'm going
> to get blamed if it's not there.  Well, Donna didn't have
> the money in the account.
>
> So I got up and I started rattling off just we have
> this much money coming in for real estate taxes.  We
> owe this much for payroll.  We owe this much for debt
> service.  Just various things.  And, so, it turned out to be,
> you know, the council was very neutral.  They were
> listening to me, you know, asking me questions.
>
> Mr. Lawton, I could see, was not happy.  I could
> tell.  He was not scowling, but just frowning there.  Not
> smiling.  Just thinking like – but at the time I was just
> giving my report and, based on the numbers, it was, like,
> we have $15 million, you know – I think it was like $14
> million coming in in revenue.  $29 million in expenses.
> Where is this 15 million going to come from?  And, I
> think, Mr. Irving said it – "Okay.  So it looks like we are
> going to need about $15 million, Donna?"  And, you
> know, I said "Yeah.  You know, it seems like that."  I did
> say though that Mr. Lawton and I were working a
> solution.  We're working on achieving or finding this

money.   And, you know, I gave my report and nobody was upset with Mr. Lawton at the report.   It's not, like, the council was on him about it.   They were asking him questions and he would respond based on some of the things I said.   Like, we are going to do internal payments.   Meaning, we were going to get money from, say, the courts or various sources – different funds that the county has that we can draw money on.   Like, we did the previous years.

So that was my report, you know.

(Doc. 90, Ex. 4, Magni Dep. at 29:10-31:4.)   Rather than supporting Ms. Magni's allegations that she spoke at this hearing simply in her role as a private citizen, her testimony makes clear that she was laying out for the County's governing officials the state of the budget deficit, and reporting that she and the County Manager were working on finding a solution to the problem.   There is no way to interpret this testimony as anything other than what Ms. Magni herself reports it to be:  that she gave a report at a formal meeting with County officials regarding the County's financial circumstances, a meeting she attended at her boss's direction, and for which she prepared as part of her duties as the Interim Director.   Ms. Magni's attempt to frame her role in this meeting as a private citizen speaking on a matter of public concern relating to issues she learned as part of her job, rather than as the Interim Director as part of her official duties, is flatly belied by her own testimony.

Ms. Magni's case is factually similar to that presented in *Barnes v. Brown*, where the United States District Court for the Eastern District of Pennsylvania

found that the Northampton County Director of Human Resources spoke as part of her official duties when she expressed concerns about the county's I-9 compliance. Barnes went to an attorney in the County Solicitor's office to confirm human resources requirements regarding the documents that would satisfy the I-9 requirements. It appears that this was an issue of particular significance to Barnes, and she undertook a number of steps to ensure that the I-9 requirements as she understood them were followed. 2016 WL 5376023, at *3-4. As a final step in this process, Barnes attended a County cabinet meeting, where she raised what she perceived as the County's I-9 compliance problems and she advised the cabinet that the Human Resources Department needed assistance in bringing the County compliant with federal law. *Id.* at *4. She further advised the officials that the County needed to comply or else could face potential fines or legal penalties. *Id.* Barnes was subsequently fired by the County Executive, and she claimed that the termination constituted retaliation for her speaking out on the immigration issues. *Id.*

The district court found that Barnes's statements fell within her job duties as she "came across an issue with how the County was processing new employees and verifying their eligibility to work, which is precisely within the scope of what a human resources department handles." *Id.* at 8. The court further noted that the plaintiff made the statements at a cabinet meeting where she was present as a

member of the cabinet and not simply in her capacity as a private citizen.  *Id.*  The

court found that the audience of an employee's speech "is an important

consideration in determining whether speech is 'official' or 'citizen' speech."  *Id.*

(quoting *Scrip v. Seneca*, No. 15-2637, 2016 WL 3162695, at *4 n.4 (3d Cir. June

7, 2016)).  The court observed that the facts did not show that Barnes had learned

about misconduct related to her job and later reported the matter to the press, or

that she spoke as part of an outside investigation, or through testimony before a

court.  *Id.*[6]  Likewise, the court found that Barnes's statements at the cabinet

meeting were not merely related to her job duties.  *Id.*  Instead, Barnes's speech to

the cabinet was given to other county officials in her role as the Director of Human

Resources, regarding a subject that was not only related to her job duties but was

something for which she was responsible.   In conclusion, the court found as

follows:

> Because the undisputed facts demonstrate that Barnes
> made her statements to Brown and at the cabinet meeting
> pursuant to her duties as the County's Director of Human
> Resources, the court need not determine whether the
> compliance issue was a matter of public concern, or
> whether the County had an adequate justification for
> treating Barnes differently from any other member of the
> general public because of her statements.  She was not

---

[6]   *See Lane v. Franks*, 134 S. Ct. 2369, 2379-80 (2014) (testifying before grand
jury); *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 990 (3d Cir. 2014) (giving
statements about procurement issues to the press); *Byars v. Sch. Dist. of Phila.*, No.
CIV. A. 12-121, 2015 WL 48776257, at *14 (E.D. Pa. Aug. 13, 2015) (outside
investigation).

speaking as a citizen, and her statements thus do not fall
under First Amendment protections.

*Id.* at *9.

The analysis in *Barnes* applies with equal force to the facts of this case, where Ms. Magni participated in a County Council meeting as part of her role as the Interim Director of the Finance and Budget department, and spoke to the County Council about budgetary matters that were at the very heart of her job responsibilities. Regardless of whether Luzerne County's budget challenges in the latter months of 2013 were a matter of public interest, Ms. Magni's role in delivering this information to the County Council was not undertaken as a private citizen but as a County official about matters that fell within her bailiwick at the Interim Director. Accordingly, First Amendment protections do not attach to this speech, and Ms. Magni's retaliation claim fails as a matter of law.

## B.    Due Process

Ms. Magni also contends that the defendants violated her right to due process when they fired her on January 31, 2014. In her complaint, Ms. Magni argues that she was a "career service" employee who could only be terminated for just cause, and she claims she was provided no notice or reason for her termination. She likewise claims, apparently without any dispute from the defendants, that she was not granted any hearing or other form of due process prior to her discharge. (Doc. 37, Am. Compl., Count 4.)

The plaintiff's due process claim is grounded in her reading of both the Luzerne County Home Rule Charter (Doc. 90, Ex. 1), and the County's Personnel Code (Doc. 90, Ex. 2).  In short, Ms. Magni argues that the Home Rule Charter as implemented through the Personnel Code granted her a protected property interest in her employment; makes clear that she was not an exempt employee; and should be construed to provide that she could be terminated only for just cause.

The Home Rule Charter provides, in part, as follows:

> **Section 7.01 – Personnel Code.**  There shall be a Personnel Code that shall establish and maintain the means to recruit, select, develop, and maintain a qualified, ethical, efficient, effective, productive, and responsive work force in order to best meet the needs of Luzerne County.

The Home Rule Charter does not, by its terms, provide a comprehensive delineation of employment categories and distinctions regarding the manner in which employees may be discharged.  Instead, the Charter provides guidance as to the scope of the Personnel Code and identifies different categories of employment within the County.  For example, Section 7.03 provides as follows:

> **Section 7.03 – Scope of Personnel Code.**  Except as may otherwise be provided for in this Charter or applicable law, the Personnel Code shall apply to every County division, department, bureau, office, agency, board, commission, and other administrative unit as well as the offices of all elective County officials, the Judiciary, and Office of Court Administration and shall cover all employees of the County, all members and employees of all County boards and commissions,

24

members of County authorities, all elective County officials and all employees in their offices, and all employees of the Judiciary and Office of Court Administration.  Consistent with all applicable contracts and laws, the Personnel Code shall provide, but not be limited to, policies, procedures, rules, and regulations governing employee recruitment, examinations, selection, promotion, and establishment and use of eligibility lists; training, orientation, and career development; job descriptions and classification; salary and employee benefits administration; discipline, force reduction, and discharge; grievances; working conditions including safety; civil service systems; labor relations; equal employment opportunity; whistleblower protection; and other policies, practices, and procedures desirable for efficient and effective personnel management.

(Doc. 90, Ex. 1, Luzerne County Home Rule Charter § 703.)  Section 7.04 of the

Charter provides an outline regarding categories of employment within the County:

**Section 7.04 – Career Service, Exempt Service, and State Civil Service.**  Each elective County official and employee of Luzerne County shall be a member of the career service, exempt service, or part of the state civil service system.

A.    The Personnel Code shall define the County positions to be included in the career service.  The career service shall be designed to attract, appoint, and promote the best qualified individuals on the basis of a fair and open competitive process.  The Personnel Code shall set forth the process by which employees in the career service shall be appointed and promoted on the basis of merit and fitness as demonstrated by valid and reliable examinations, other objective evidence of competence, and/or other relevant factors.

B.    The exempt service shall consist of all elective County officials and certain policy-making and other

25

positions filled outside the career service provisions as defined in the Personnel Code.   Except for elective officials and others serving fixed terms, those appointed to these positions shall serve at the pleasure of the person authorized to make the appointments.

C.      The terms and conditions of the state civil service system shall cover those employees required to be included in a state civil service system.

(*Id*. § 7.04.)

Pursuant to the requirements outlined in the Charter, the Section 1002.01 of the County's Personnel Code provides in relevant part the following composition of the County's workforce:

A.      The County "Career Service" shall be a permanent service to which the provisions of this article shall apply. It shall comprise all positions in the County Government now existing, or hereafter established, with the exception of those persons listed in Section 1002.01 (B).

B.      "Exempt Service" positions shall consist of positions held by all elected officials, the County Manager, Chief Public Defender, Chief County Solicitor, Division Heads, Clerk of Council and other positions as promulgated    under    the    Home    Rule    Charter. Classification of positions in the County Exempt Service does not depend on whether positions are exempt or non-exempt positions as specified under 29 CFR Part 541, Section 13(a)(1) of the Fair Labor Standards Act and its amendments as made from time to time.  Exempt Service positions other than elected positions shall be filled using a merit-based recruitment and selection process, with the clear intent of attracting well-qualified individuals on the basis of a fair and open competitive process.

(Doc. 90, Ex. 2, Luzerne County Personnel Code § 1002.01(A) and (B).)

By its terms the Personnel Code purports to confer broad protections to non-exempt County employees, and in Section 1005.02 provides that:

> Except as the Charter provides, any dismissal, demotion to a lower-paid position, or suspension of any non-probationary employee without pay shall be for just cause only.  Just cause may be, but is not limited to consistently perform required duties, absenteeism, delinquency, misconduct, incompetence or inefficiency, poor performance, inappropriate conduct, or violations of the ethics code.

(*Id*. § 1005.02(B).)

Based upon her reading of these separate provisions of the Home Rule Charter and the Personnel Code, and the fact that the Deputy Director of Budget and Finance is not an employment category specifically identified as "exempt" under the Charter or the Personnel Code, the plaintiff contends that she was a career service employee, therefore had a property interest in her employment protected by the Fourteenth Amendment, and that the County accordingly needed "just cause" in order to terminate her.

The defendants disagree, and argue that the provisions of the Personnel Code regarding termination for "just cause" are of no legal force at all – not only as to Ms. Magni but as to any County employee – because these protections are not included within the Charter itself and are instead only laid out in the Personnel Code.  Honing in on cases where courts have held that municipalities cannot establish property interests in employment through personnel codes alone, and

27

particularly without a specific grant of legislative authority by the Commonwealth itself, the defendants argue that the "just cause" provision is legally meaningless, and provides Ms. Magni with no protections in her employment.

In contrast, Ms. Magni relies on a decision from the Third Circuit Court of Appeals that was handed down after her termination, holding that where the due process protections are identified and provided within a Home Rule Charter itself, an employee subject to those protections has a legally enforceable property interest in her employment. *See Mancini v. Northampton Cty.*, 836 F.3d 308 (3d Cir. 2016). The plaintiff thus argues that the County was empowered to provide procedural due process protections for employees under the Home Rule Charter, and she claims that the County did provide these protections for career- service employees by providing that categories of employment and the protections that apply to them would be set forth in the Personnel Code that the Home Rule Charter expressly provided for.

The Fourteenth Amendment to the United States Constitution prevents the government from depriving an individual of liberty or property interests without due process of law. U.S. Const., amend. XIV, § 1. A plaintiff asserting a due process violation must demonstrate that (1) she was deprived of a liberty or property interest and (2) the procedures afforded to the plaintiff relating to that deprivation failed to comport with the requirements of due process. *Hill v.*

*Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006).  A protected property interest exists only if the plaintiff has "a legitimate claim of entitlement" to the interest. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972); *Hill*, 455 F.3d at 234; *Elmore v. Cleary*, 399 F.3d 279, 282 (3d Cir. 2005) (property interest in employment requires entitlement to the continued employment).

Although property interests are protected under the federal Constitution, the interests themselves are created by other law, such as state law. *Roth*, 408 U.S. at 577 (property interests derive from independent sources like state law); *Hill*, 455 F.3d at 234 (existence of property interest is "a question answered by" state law); *D'Altilio v. Dover Twp.*, Civ. A. No. 1:06-CV-1931, 2007 WL 2845073, at *5 (M.D. Pa. Sept. 26, 2007); *Pappas v. City of Lebanon*, 331 F. Supp. 2d 311, 316 n.9 (M.D. Pa. 2004); *Majewski v. Luzerne Cnty.*, No. 3:05-cv2396, 2007 WL 1074769, at *19 (M.D. Pa. April 9, 2007).  In accordance with the well-settled law in this area, Pennsylvania law governs whether Ms. Magni had a protected property interest in her employment with Luzerne County, and indeed the parties seem to agree on this point.

Property rights subject to federal due process protection arise under Pennsylvania law in one of three ways.  First, the Commonwealth's General Assembly may create a protected property interest through legislative action or authorization. *D'Altilio*, 2007 WL 2845073, at *6; *Aguilar v. Pa. Apple Mktg.*

*Program*, No. 1:05-CV-0804, 2006 WL 167820, at *6 (M.D. Pa. Jan. 16, 2006) (noting that property rights may be created by state legislative action); *Pivarnik v. Commonwealth, Dep't of Transp.*, 474 A.2d 732, 733 (Pa. Commw. Ct. 1984) (citing *Scott v. Phila. Parking Auth.*, 166 A.2d 278, 280 (1960) ("In Pennsylvania, public employees gain an enforceable expectation of continued employment in their jobs through legislative action.").

An employee may also obtain an enforceable property interest in continued employment through a contract that grants the employee protected status, such as tenure. *Unger v. Nat'l Residents Matching Program*, 928 F.2d 1392, 1399 (3d Cir. 1991) (contracts granting protected status create property rights that may be enforced); *see also Linan-Faye Constr. Co. v. Housing Auth. of Camden*, 49 F.3d 915, 932 (3d Cir. 1995) (observing that contracts granting protected status receive due process protection); *D'Altilio*, 2007 WL 2845073, at *6 (same); *Aguilar*, 2006 WL 167820, at *6 (same).

Lastly, an employment contract that provides that the employee may only be dismissed for cause is sufficient to create a protectable property interest. *See Unger*, 928 F.2d at 1399 (discussing the protection that is conferred on employment contracts that are expressly terminable only for cause); *Linan-Faye*, 49 F.3d at 932 (extending procedural due process protection to employment contracts that are terminable only for cause).

It is well-settled under Pennsylvania common law, however, that in the absence of an employment contract that the municipality was specifically authorized to enter, employment with the Commonwealth or its municipalities is at-will unless the General Assembly has enacted legislation that allows it to be altered. *Elmore v. Cleary*, 399 F.3d 279, 282 (3d Cir. 2005) ("[A] local government in Pennsylvania cannot provide its employees with tenure status unless there exists express legislative authority for doing so."); *Knox v. Bd. of Sch. Dirs. of Susquenita Sch. Dist.*, 888 A.2d 640, 647-48 (Pa. 2005) (absent legislative action, public employment in the Commonwealth is at will); *Scott*, 166 A.2d at 280-82 ("Tenure in public employment . . . is . . . a matter of legislative grace. . . . [W]here the legislature has intended that tenure should attach to public employment, it has been very explicit in so stating . . . ."). Accordingly, without enabling legislation that expressly permits a municipality to change an employee's status, including through the use of personnel policies or employee handbooks, any effort of the municipality to alter an employee's at-will status is without any legal effect. *See Elmore*, 399 F.3d at 283 (holding that even though the municipality purported to grant "just cause" status as office manager, it lacked authority to do so under Pennsylvania law); *Short v. Borough of Lawrenceville*, 696 A.2d 1158, 1158 (per curiam) (Pa. 1997) (holding that Pennsylvania municipalities "cannot contract away the right of summary dismissal.").

31

The employer in this case is Luzerne County, which operates under a Home Rule Charter that the County enacted pursuant to the Pennsylvania Home Rule Charter and Optional Plans Law, 53 Pa. Cons. Stat. Ann. §§ 2901 et seq.  (the "Home Rule Act"); (Doc. 90, Ex. 1, Luzerne County Home Rule Charter.)  Under the Act

> A municipality which has adopted a home rule charter may exercise any powers and perform any function not denied by the Constitution of Pennsylvania, by statute or by its own home rule charter.  All grants of municipal power to municipalities governed by a home rule charter under this subchapter, whether in the form of specific enumeration or general terms, shall be liberally construed in favor of the municipality.

53 Pa. Cons. Stat. Ann. § 2961; *see also* Pa. Const. Art. 9, § 2 ("A municipality which has a home rule charter may exercise any power or perform any function not denied by the Constitution, by its home rule charter or by the General Assembly at any time."); *Delaware Cnty. v. Middletown Twp.*, 511 A.3d 811 (Pa. 1986) (home rule municipality's exercise of power is valid absent limitation found in the Pennsylvania Constitution, acts of the General Assembly, or the home rule charter itself, with ambiguities to be resolved in favor of the municipality); *In re Pittsburgh Citizen Police Review Bd.*, 36 A.3d 631 (Pa. Commw. Ct. 2011) (presumption exists that the exercise of power by a municipality is valid if no restriction exists in the Pennsylvania Constitution, the charter itself, or acts of the General Assembly).

The Home Rule Act also sets forth enumerated areas where municipalities that enact home rule charters may not legislate.  52 Pa. Cons. Stat. Ann. § 2962. None of the limitations purport to restrain a municipality from establishing that certain of its own employees may only be terminated for cause, and in fact the limitations in the Act appear not to address employment issues except in very specific areas.[7]  Given the broad grant of authority to home rule municipalities to legislate and self-govern, and given the fact that the Act provides that municipalities "may exercise any powers and perform any function not denied by the Constitution of Pennsylvania, by statute or by its own home rule charter," with

---

[7]   The Act specifically provides that a municipality shall not (1) engage in proprietary or private business except as authorized; (2) exercise power contrary to or in limitation or enlargement of powers granted by statutes which are applicable in every part of the Commonwealth; (3) be authorized to diminish the rights or privileges or any former municipal employee entitled to benefits or any present municipal employee in his or her pension or retirement system; (4) enact ordinances or regulations with respect to definitions, sanitation, safety, health, standards of identity or labeling pertaining to, inter alia, the manufacturing or sale of goods and services otherwise subject to Commonwealth statutes and regulation; or (5) enact any provision inconsistent with any statute that predates the Act affecting the rights, benefits or working conditions of any employee of a political subdivision of the Commonwealth. 53 Pa. Cons. Stat. Ann. § 2962(c).  This last subpart, though it speaks to "the rights, benefits or working conditions" of government employees, provides only that the home rule municipality cannot enact provisions that would be inconsistent with an *act* of the General Assembly, and says nothing about common-law rules regarding at-will employment.

The same subpart also prohibits home rule municipalities from determining the "duties, responsibilities or requirements placed upon businesses, occupations and employers." 53 Cons. Stat. Ann. § 2962(f).  Although it is not clear from the text of the Act whether this applies to employees of the municipality itself, such an interpretation would seem questionable, as it would restrain the municipality from determining the rights and responsibilities of its own workforce.

all ambiguities being resolved in favor of the municipality, we believe there is at least a genuine question as to whether there is any constraint on a home rule municipality like Luzerne County contracting or otherwise providing for something other than at-will employment relationships with its employees. Indeed, to the extent that at-will employment in Pennsylvania is a matter of longstanding common law – and not a matter established by the Pennsylvania Constitution or an act of the General Assembly – it seems one could make a good-faith argument that the General Assembly's decision to grant home rule municipalities broad authority over their self-governance could also include the right to confer employees with protected property interests in their employment.[8]   The parties have not squarely addressed this issue, and our research has not uncovered a clear answer to this question.

---

[8]   As an example suggesting that the Home Rule Charter and Optional-Plans Law confers broad authority on home rule municipalities to establish particular hiring and firing practices, the Pennsylvania Commonwealth Court has held that a home rule charter may deviate from "customary practice[s]" of certain aspects of employment law with respect to the hiring and firing of municipal employees, specifically finding that the Home Rule Charter and Optional-Plans Law gives home-rule municipalities the authority to do so. *City Council, City of Reading v. Eppihimer*, 835 A.2d 883, 893-94 (Pa. Commw. Ct. 2003) (holding that "in Pennsylvania, because the State Constitution does not dictate the separation of powers at the local government level, there is no Constitutional separation of powers at the local government level. . . . Accordingly, although the Charter may deviate from the customary practice of providing supervisors with authority to hire and fire employees they supervise, the enabling legislate (HRC & OPL) provides the City with the authority to do so, and such authority is not constitutionally infirm . . . .") (internal citation omitted).

However, we ultimately do not find it necessary for the Court to predict the answer to this question of state law for three reasons.  First, unlike in *Mancini* where the home rule charter expressly provided that employees could only be terminated for just cause, the Luzerne County Home Rule Charter does not.  Instead, Luzerne County's charter provides only for general categories of employment and provides that the County would adopt a personnel code implementing the charter's categories and more specifically governing employment issues.  Thus, the precise factual issue that the Third Circuit relied upon in finding that the plaintiff in *Mancini* had a protected property interest in his employment – the existence of language in a home rule charter creating the property interest – is not present here.

Secondly, we cannot ignore the line of Pennsylvania cases, and the federal decisions that follow them, which uniformly hold that a municipality may not alter the presumed at-will status of its employees through language used in a personnel code, absent an express grant of statutory authority from the General Assembly.  It may be that by granting home rule municipalities under the Home Rule Act broad powers of self-governance the General Assembly was also conferring the right to provide for protected property interests in employment through personnel manuals or contracts, the Home Rule Act does not explicitly confer this authority, and we have not found any Pennsylvania decision holding that it does.  Thus,

notwithstanding the Third Circuit's holding in *Mancini*, which dealt only with a home rule charter itself, case law indicates that where a personnel code alone purports to alter the at-will employment relationship, it is of no legal effect.

Lastly, given what we have found to be ambiguity in this area of the law, and in the scope of a home rule municipality's authority to alter the at-will employment relationship with its employees, we find that this is a textbook case where the defendants should be granted qualified immunity on Ms. Magni's due process claim. In short, even if the defendants were mistaken in believing that they could terminate the plaintiff's employment for any reason or no reason, the numerous state and federal decisions cited above would provide a reasonable municipal manager or supervisor grounds to believe that they acted lawfully in believing that Ms. Magni's employment remained at will, and that she was not entitled to any of the process she claims she was owed.

The doctrine of qualified immunity shields governmental officials from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, -- U.S. -- , 136 S. Ct. 305, 308 (2015). The qualified immunity inquiry has two parts. The first asks whether the plaintiff has alleged sufficient facts to "make out a violation of a constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The second question is "whether the right at issue was clearly

established at the time of [the] defendant's alleged misconduct." *Id.* (internal quotation marks omitted).  A court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis" to address first "in light of the circumstances of the particular case at hand." *Pearson*, 555 U.S. at 236.

A right is "clearly established" when, "at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (alterations in original).  "If no case speaks directly to the legality of the officer's conduct, the challenged conduct [needs] to be such that reasonable officers in the defendant['s] position at the relevant time could have believed, in light of what was in the decided case law, that their conduct was lawful." *Geist v. Ammary*, 40 F. Supp. 3d 467, 485 (E.D. Pa. 2014) (citing *Giuffre v. Bissell*, 31 F.3d 1241, 1255 (3d Cir. 1994)) (internal quotations omitted).

Qualified immunity is intended to immunize governmental officials from liability except in those cases where it would be objectively unreasonable for officers to believe that their conduct was warranted.  As the Third Circuit recently observed, "[t]hat threshold is a high one." *Thompson v. Howard*, -- F. App'x --, 2017 WL 655763, at *4 (Feb. 17, 2017).  The doctrine exists because "it is

inevitable that [ ] officials will in some cases reasonably but mistakenly" believe that their actions are justified and permissible. *Anderson*, 483 U.S. at 641. Qualified immunity thus "gives ample room for mistaken judgments" and "protect[s] all but the plainly incompetent or those who knowingly violate the law." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 254 (3d Cir. 2010) (internal quotation marks and citations omitted). For that reason, qualified immunity applies unless it is "beyond debate" that an official acted unreasonably, *Mullenix*, 136 S. Ct. at 309, and unless "every reasonable official would [have understood] that what he [was] doing violate[d]" the right at issue. *Reichle v. Howards*, 566 U.S. 658, 132 S. Ct. 2088, 2093 (2012) (internal quotation marks and citation omitted) (first alteration in original). As the Supreme Court clarified, while "[w]e do not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 136 S. Ct. at 308.

In this case, it simply cannot be said that whether Ms. Magni was entitled to some sort of notice and opportunity to be heard before she was terminated in January 2014 was "beyond debate." To the contrary, if anything the relevant case law existing at the time of Ms. Magni's termination uniformly indicated that absent an express grant of authority from the General Assembly allowing a municipality to provide for something other than at-will employment for its workforce, all employment would remain at will. Indeed, the only case that the plaintiff relies on

in support of her view that she had a legally protected interest in her employment is found in the Third Circuit's *Mancini* decision, which was handed down in 2016, long after the defendants fired Ms. Magni, and therefore could not possibly be considered "existing precedent" that "placed the statutory or constitutional question beyond debate." *Mullenix*, 136 S. Ct. at 308. Accordingly, even if the evidence supported Ms. Magni's allegations regarding her right to due process, no reasonable official in the defendants' position would have known or even had substantial cause to believe that terminating Ms. Magni's employment without notice or a hearing would violate due process under the law as it existed at the time. Accordingly, the defendants should be granted qualified immunity on the plaintiff's due process claim.

## V.    <u>RECOMMENDATION</u>

For the foregoing reasons, IT IS RECOMMENDED that the defendants' motion for summary judgment, (Doc. 89), be GRANTED.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge

shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.


/s/  Martin C. Carlson
Martin C. Carlson
United States Magistrate Judge

Dated: May 29, 2018